## SNODGRASS *v.* ZANDER & COMPANY.

### Opinion delivered February 3, 1913.

1. CORPORATIONS—STOCK SUBSCRIPTION.—A preliminary stock subscription contract is a valid agreement on the part of the subscribers to take preferred stock, and after the formation of the corporation and the issuance of the preferred stock, the corporation can maintain an action against the subscribers for the amount subscribed. (Page 468.)

2. CORPORATIONS—PREFERRED STOCK.—A corporation can not maintain an action on a subscription for preferred stock until it has issued or tendered the stock. (Page 469.)

3. CORPORATIONS—STOCK SUBSCRIPTIONS.—Although in a contract of subscription for stock it is understood that the amount of the preferred stock shall be $4,000.00, neither more nor less, the contract is not a joint obligation and the striking of the name of one subscriber from the list, or the unauthorized signature of another would not invalidate the contract, nor would the fact that more than $4,000.00 was subscribed, invalidate it as against those who had properly signed it and would not release them from the payment of their subscription upon a substantial performance of the contract by the corporation. (Page 469.)

4. CORPORATIONS—STOCK SUBSCRIPTION—PAROL EVIDENCE TO VARY.— Where nothing is said in a written stock subscription contract to limit the amount of the capital stock of the corporation to any particular amount, parol testimony is inadmissible to vary or con-

tradict the written contract, nor can an oral agreement or condition be engrafted upon it by parol testimony. (Page 470.)

Appeal from Benton Circuit Court; *J. S. Maples,* Judge; affirmed.

### STATEMENT OF FACTS.

Appellee brought suit against appellants and five others, who did not appeal here, in justice court, alleging that each of the said appellants was indebted to it in the sum of $100 for subscriptions to the capital stock of the corporation. It alleged in the complaint against G. M. Snodgrass that he was likewise indebted to it in the sum of $100 on subscription to the capital stock, which stock he had accepted and given his check in payment for, but had thereafter stopped payment of the check. Appellants filed an answer, five of them denying that they had subscribed for stock in the corporation and four of the others admitting that they did; all, however, denied that they were indebted, because their subscriptions, if any were made, were on condition that appellee company would bring to Rogers and equip a glove factory, the assets of which should invoice not less than $6,000, at a reasonable valuation, and that its payroll should approximate $2,000 per month from the beginning of operations, and that the amount disbursed for wages would largely increase if additional capital were secured for the purchase of additional material. They alleged it was agreed that the preferred stock should remain in the hands of the original subscribers and have representation on the board of directors, that the capital stock was to be $6,000 common and $4,000 preferred, no more and no less, and the name of the corporation to be E. A. Zander & Sons; they denied that the conditions had been complied with, alleging that the factory, as equipped, was not worth more than $2,500, and the payroll had not amounted to more than $300 per month. That the preferred stock had never been represented on the board of directors; that the company was incorporated for $25,000 instead of $10,000, and in the name of E. A. Zander & Company instead of E. A. Zan-

der & Sons; denied that the $4,000 preferred stock was ever subscribed and alleged that none of the subscriptions were to become due until the conditions were performed.

Appellant, Snodgrass, admitted that he gave his check in payment for his subscription, but alleged that it was obtained upon misrepresentation, and that the conditions of the contract had not been complied with.

The case was appealed to the circuit court where judgment was rendered in favor of appellee, and from the judgment there this appeal comes.

The testimony shows that the Commercial Club of Rogers desired the location of a glove factory at that place and began negotiations with E. A. Zander & Sons, owners of a glove factory at Buchanan, Mich., with a view to having one constructed and operated at Rogers. It solicited subscriptions to the capital stock of such corporation, the subscribers signing the following instrument:

Whereas, The Rogers Commercial Club, of Rogers, propose to locate here a leather glove factory, to be operated by E. A. Zander & Sons of Buchanan, Mich., at present, said E. A. Zander & Sons to bring to Rogers a completely equipped factory, the machinery and other property, assets of which shall invoice not less than $6,000 at a reasonable cash value, and

Whereas, the payroll of said factory will be approximately $2,000 per month to begin with, and which payroll can be largely increased if additional capital is secured for the purchase of raw material and the expansion of the business in other legitimate ways, and

Whereas, the board of directors have investigated the proposition, and believe that a factory of this kind employing girl and woman labor and using motor power, can reasonably expect to be a financial success, and will be of great benefit to our people;

Therefore, we, the undersigned, hereby agree to subscribe for the number of $100 shares (or equivalent in smaller shares) of the preferred stock of said Zander &

Sons Company, to be organized, on arrival here, it being understood that the amount subscribed shall amount to $4,000, neither more nor less, and that the preferred stock issued to cover shall be a lien on all the assets of the company, and bear 8 per cent interest, not otherwise participating in the earnings of the company; also, each of the undersigned agreed to pay to the secretary of the Commercial Club on demand, the sum of $10 to be used by the club in defraying the expenses of said Zander & Sons, their skilled workmen and machinery from Buchanan, Mich., to Rogers, Ark., towit:

| Signed | Shares | Exp. | Signed | Shares | Exp. |
|---|---|---|---|---|---|
| Jas. J. Keiser | 1 | $10.00 | Cowan & Freeman | 1 | $10.00 |

and others, showing forty shares subscribed exclusive of two names for one share each marked off.........

Some of the appellants denied that they ever signed the agreement at all, others stated that they signed or authorized their signatures for $10 expense money for the removal of the factory to Rogers, while others testified that their subscriptions were procured through fraudulent representations, claiming the solicitors stated to them that the preferred stock had all been taken by the banks, and that they were only signing for expense money.

E. A. Zander & Sons organized the appellee corporation under the name of E. A. Zander & Company, moved their factory to Rogers, setting it up, fully equipped and putting it in operation; its president stating that he was formerly located in the glove manufacturing business in Michigan; that he wanted to change to the South, came to Rogers, after having learned that they desired a factory, and talked it over with the Commercial Club; told them he did not want a bonus, but preferred subscriptions to the capital stock, and the club offered $4,000 subscriptions to the preferred stock, and the subscription contract was presented to the subscribers by members of the club, and signed by them. That he brought the factory to Rogers, the machinery and equipment being worth

$6,000, its reasonable market value. That the wages paid the employees for the operation did not amount to $2,000 per month when he began operation, because he did not have money enough to conduct the business on that scale, the subscribers to the capital stock having refused to pay anything; that the corporation was organized, the factory built and the $4,000 preferred stock issued. E. A. Zander, the secretary and treasurer testified likewise as to the valuation of the factory and the equipment and the cause of the failure to pay but $200 per month for wages and expenses of operation.

Another witness of eleven years' experience in the glove manufacturing business examined the machinery, stated it was in good condition, although some of the machines were not new; that the wax thread machines were not new, but that that kind of machines were in use in good factories.

C. E. Benton testified he was a preferred stockholder, had handled machinery all his life and built the factory, "Have examined the machinery; looks like a smooth, up-to-date factory. I am a signer of the subscription contract."

F. L. Wallin stated: Am a druggist and member of the Commercial Club. J. M. McClelland was appointed to solicit subscriptions, and I assisted him at his request; told me the banks would loan money on the stock at 8 per cent. J. W. Walker, president of the Citizens Bank, said the banks had agreed to do this. I called on most of the subscribers, handed them the subscription list to read; some of them had no time to read it and asked me what it was. I told them it was a subscription contract to get E. A. Zander & Sons' factory to come to Rogers; explained the character of the factory and probable benefits to the town; also that the contract was two in one; first, they could subscribe for one share of stock, then they were to pay $10 to the Commercial Club, for the expense of moving the factory to Rogers; explained this stock and $10 too; told them when factory arrived, they would be called on to pay $10; when the corporation or-

ganized stock would be issued. Also, that if the factory was unsuccessful the subscribers would lose their subscriptions; didn't make any misrepresentations; had absolutely no interest in the matter. Saw the factory after it was constructed; have been around factories all my life, and this one looked like a neat, clean proposition; saw only two old machines. Others looked like good machines to me. Didn't state to any subscriber what the capital stock would be; didn't know. Mr. Zander told me what the capital stock would be. I was representing the Commercial Club and the people; never represented Mr. Zander in any way.

J. W. Walker, a banker and director of the Commercial Club said he understood the factory then in operation was to be brought to Rogers from Michigan, that he had seen the factory in operation in Rogers, and considered it nicely operated; that the invoice was accepted by the Commercial Club, subject to future investigation and a committee was appointed to investigate and examine the machinery.

F. W. Hardy stated he was president of the Commercial Club; that there were negotiations pending between E. A. Zander and the Commercial Club, relative to moving the Zander glove factory from Buchanan, Mich., to Rogers, Ark., that he was not representing Mr. Zander, but the Commercial Club, an organization of the business men of the city, who desired to promote the welfare of the community. That it was seeking to locate the factory in Rogers, which might give employment to the unemployed. "It was held out to us that the glove factory would be moved to Rogers, provided the citizens would subscribe to $4,000 of the preferred stock. We agreed to do that and circulated a subscription list and procured subscription to the stock. Mr. Zander, the proprietor of the glove factory, then located in Michigan agreed that he would move his factory to Rogers on those conditions. There was no contract between the Club, and Mr. Zander, in writing, at the time of procuring the subscriptions to the capital stock.

The secretary of the Commercial Club, Mr. J. M. Mc-Clelland, assisted in the circulation of the subscription contract and stated that he made absolutely no false representations to the signers thereof, and had no interest, except that of a preferred stockholder, who had subscribed the contract and paid for his stock. The subscription contract was in the hands of the Commercial Club about three weeks before it was turned over to Zander & Company; I think the names were erased before the contract was turned over to Zander & Company; was not representing Zander when I solicited subscriptions.

There was much testimony introduced by witnesses claiming to be familiar with machinery and the valuations, tending to show that the factory, as constructed, was not worth more than $2,000 or $2,500, and some relative to a supposed agreement to capitalize the corporation at $10,000 instead of $25,000; some of the subscribers claiming such representation was made to them at the time of their subscription, and also as to the erasure of the names of some of the subscribers from the list.

The court instructed the jury, refusing appellants' six requested instructions.

The jury returned a verdict for appellee company, and from the judgment thereon appellants bring this appeal.

*Rice & Dickson,* for appellants.

Appellee *pro se.*

KIRBY, J., (after stating the facts). No question was made at the trial that appellee had no right to bring the suit because of an alleged assignment of the contract of stock subscription and it can not be insisted upon here.

The preliminary stock subscription contract was signed by the subscribers thereto and constituted a valid agreement to take the stock upon which the corporation after its formation and the issuance of the preferred stock could maintain an action against the subscribers for the amount in payment. 10 Cyc. 388-392; *Woodruff* v. *McDonald,* 33 Ark. 102; *Miss. O. & R. Ry. Co.* v. *Cross,*

20 Ark. 443; *Nulton* v. *Clayton,* 54 Iowa 425; 6 N. W. 685; *Peninsular Ry. Co.* v. *Duncan,* 28 Mich. 130; *Collins* v. *Southern Brick Co.,* 92 Ark. 507.

Cyc. says: "A subscription paper may be informal, yet if the intent of the subscriber can be collected from it as where it states the names and residence of the shareholder and the number of shares taken by each it constitutes a subscription to the shares of the forthcoming company and the corporation may maintain actions upon it against the signers."

It states the exception in the case of preferred shares as follows: "Preferred stock being something more than a mere evidence of a shareholder's right to participate in the management of the affairs of the company and to receive dividends, but being in the nature of an interest-bearing security, it has been said that the implied promise of the company to issue such stock, and of the subscriber to pay for it where the subscription is to stock of this kind, are concurrent and dependent, and that an action by the company on such a subscription can not be maintained until it has issued or tendered the stock." 10 Cyc. 390.

No question is made in this case that the company was not organized nor that the preferred stock was not properly issued and tendered to the subscribers therefor.

The court did not err in refusing to give appellants' requested instructions 1 and 4. One correctly states that if a defendant did not sign or authorize the signing of the subscription contract, they should find for that defendant, or defendants, but, by its terms, the jury were instructed that if one or more of the defendants did not sign or authorize the signing of the subscription contract, and it required the signatures of such a one as had not signed it to make up the amount of $4,000 preferred stock to be subscried that they must find in favor of all the defendants; while four directs a finding against the corporation if more than $4,000 stock was subscribed.

It is true the contract of subscription says that it was understood that the amount of the preferred stock

shall be $4,000, neither more nor less, but the contract is not a joint obligation and the striking of the name of one of the subscribers from the list or the unauthorized signature of another would not invalidate the contract as against those who had properly signed it and would not release them from the payment of their subscription upon a substantial performance of the contract by Zander & Company.

Neither did the court err in refusing to admit certain testimony relating to the incorporation of the appellee company with $25,000 capital stock instead of $10,000 the amount some of the subscribers insisted it was stated to them on procuring their subscriptions the capital stock should be, nor in declining to give requested instructions relative thereto.

Nothing is said in the written stock subscription contract limiting the capital stock to any particular amount, and it could not be varied nor contradicted, or an oral agreement or condition engrafted upon it, by parol testimony. 10 Cyc. 391; *Collins* v. *Brick Co., supra.*

The jury, under proper instructions, passed upon the questions at issue relative to the substantial performance of the contract, and found in favor of appellee. There was testimony sufficient to support their finding on all controverted points, and there being no prejudicial error in the record, the judgment is affirmed.